UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LINDELL BRISCOE, | ) | |
|   individually, | ) | |
| | ) | |
| BRITTANY ARLESIA SHAMILY, | ) | |
|   individually, | ) | |
| | ) | |
| BRITTANY ARLESIA SHAMILY, | ) | |
|   *as next friend of her minor children*: | ) | |
|       B.M.C., | ) | No. |
|       B.A.S., | ) | |
|       B.L.D.B., | ) | |
|       B.R.C.B., | ) | **PLAINTIFFS DEMAND** |
|       B.A.B., | ) | **JURY TRIAL** |
| | ) | |
|     Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ST. LOUIS COUNTY, | ) | |
| | ) | |
| DETECTIVE JOSEPH PERCICH, | ) | |
|   *in his individual capacity only,* | ) | |
| | ) | |
|     Defendants. | ) | |

**COMPLAINT**
**CIVIL RIGHTS, 42 U.S.C. § 1983,**
**FOR DAMAGES AND MONELL LIABILITY, AND**
**FOR STATE LAW SUNSHINE ACT VIOLATION**

Plaintiffs Lindell Briscoe, Brittany Arlesia Shamily, and Brittany Arlesia Shamily as next friend of her five minor children, all by counsel W. Bevis Schock and Erich Vieth, state as their Complaint under 42 U.S.C. § 1983, for damages against Detective Joseph Percich and against St. Louis County, and under RSMo. 610.010 *et seq.* for State Law Violation of the Sunshine Act.

**INTRODUCTION**

1.    There was a carjacking in South County. For unknown reasons a victim's AirPods ended up in the street in front of Plaintiffs' house in North County. Detective Joseph Percich

used "FindMy," an Apple application which gives inexact locations of lost AirPods, to conclude, unconstitutionally, that Plaintiffs were involved in the carjacking.  He made misstatements and material omissions in his search warrant application.  He led an unjustified SWAT Team Raid on Plaintiffs' house.  Plaintiffs sue under 1983 for damages over the force and detention, use of SWAT without constitutional justification, *Monell* liability, and for a state law Sunshine Act violation.

## JURISDICTION AND VENUE

2.   Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 and § 1988, and the Fourth Amendment to the United States Constitution.

3.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

4.   This court has supplemental jurisdiction over Plaintiffs' state law Sunshine Act claims pursuant to 28 U.S.C. § 1367.

5.   Venue is proper in this Court under 28 U.S.C. § 1391 because the relevant events occurred within St. Louis County, Missouri, which is within the Eastern Division of this Court.

## COLOR OF STATE LAW

6.   At all relevant times, both Defendants acted under color of state law.  Particularly, at all relevant times, both Defendants acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of Missouri.

## JURY DEMAND

7.   Plaintiffs demand a jury trial on all factual issues, including their claims for damages.

## PARTIES

8.   Plaintiffs Lindell Briscoe and Brittany Arlesia Shamily are a middle class, married

2

couple. They reside in North St. Louis County at 1591 Knollway Drive, St. Louis, MO 63135.

9.  Lindell has convictions from 2006 for assault 1st and armed criminal action. The convictions were 17 years before this incident. He has not been in trouble since then. Brittany had an assault charge in 2005, and a forgery in 2008, with the latter of those two being 15 years before this incident. She has not been in trouble since then.

10. Lindell and Brittany are raising five children. All were present at the time of the SWAT Team Raid, and all the children are included as Plaintiffs. The children's ages at the time of the incident were: B.M.C. age 13 2010, B.A.S. age 10 2013, B.L.D.B. age 2 2021, B.R.C.B. age 1 2022, and B.A.B. age three months 2023, ("the children").

11. B.M.C. is under age 14 at the time of this filing.

12. Brittany is the mother of all the children, and Lindell is the father of the three younger children.[1]

13. The Father of B.M.C. has received notice of this suit.

14. No person has been adjudicated the father of B.A.S., and there is no person stated as her father on her birth certificate. A man who asserts he is her father last saw her briefly in approximately March of 2023, and has never provided child support or acted as her father in a material way.

15. Brittany seeks to serve as Next Friend of the five children, Fed. R. Civ. P. 17(c)(2), and she attaches a customary motion.

16. St. Louis County is a properly formed County of the State of Missouri.

---

[1] The minor children proceed here by their initials and year of birth pursuant to Fed. R. Civ. P. 5.2(a)(2) and (3).

17.     Officer Joseph Percich is an individual.  He is an officer of the St. Louis County Police Department.  Plaintiffs sue Percich in his individual capacity only.

## FACTS

### Carjacking

18.     Early in the morning on May 26, 2023, at approximately 6:00 a.m., a group of six persons, with criminal intent, arrived at the Waffle House at 3154 Telegraph Road in south St. Louis County.  They arrived in two separate cars, a Kia and a Chevrolet.

19.     Two young male patrons of the Waffle House, brothers E.O. and Z.O., walked out of the Waffle House.

20.     E.O. and Z.O. got into their car, a 2021 black Dodge Charger.

21.     Two persons from the above mentioned six-person group approached the Charger and ordered the brothers out of their car.

22.     This was a carjacking.

23.     As of this filing it is unclear to Plaintiffs whether the carjackers threatened E.O. and Z.O. with weapons.

24.     E.O. and Z.O. exited the Charger.

25.     The two carjackers drove off in the Charger.

26.     The remaining four of the original six-person group drove off in the Kia and Chevrolet.

27.     At 6:26 a.m. St. Louis County police came to the scene and started an investigation.

### Investigation, Search Warrant Application, False Statements Therein

28.     On the day of the incident Percich signed under penalty of perjury an Application for Search Warrant for Plaintiffs' home, and a customary accompanying Affidavit.  The Application and Affidavit were presented to a St. Louis County Judge.

29.     The Judge issued a Search Warrant.  The Application, Affidavit, and Search Warrant are attached as Exs. 1-3.

30.     Percich stated in the Affidavit at the second, unnumbered, paragraph of the Affidavit that he has "reason to believe" the following items are being kept and secreted at Plaintiffs' home at 1022 Wylin Court:

> Any/all firearms, ammunition, holsters, firearm related material, cellular devices, receipts, documentations, writings, clothing, video recording devices, stolen/personal property belonging to the victims or persons otherwise related to the Robbery First Degree/Vehicle Hijacking which occurred on May 26, 2023 at/near 3154 Telegraph Road.

31.     Percich never had any knowledge or indication whatsoever that any such items were at Plaintiffs' home, much less that he or anyone else had actually observed such items at Plaintiffs' home.

32.     There are no such implements of destruction at Plaintiffs' home.

33.     Numbered paras. 1-4 describe Percich's initial role in the investigation, the carjacking itself, and the arrival of police at the scene.

34.     Those paragraphs do not identify the other officers who came to the scene.

35.     The Affidavit at para. 4 states that "it was reported both subjects displayed firearms, with at least one equipped with a drum magazine."

36.     The Affidavit does not state who gave this report or who received this report.

37.     The Affidavit at para. 5 states that "video surveillance footage revealed…the suspects take possession of the vehicle and flee."

38.     There is no statement as to whether the Waffle House or some other source provided surveillance footage, or as to the clarity of the surveillance footage.

39.     That paragraph does not identify the officer who observed the video surveillance footage.

40.     The Affidavit does not state whether guns were visible on the surveillance video.

41.     At para. 6 the Affidavit states that "a witness and friend to the victims", D.B., stated that his Apple AirPods were in the Charger, and the Affidavit further stated that this witness "assisted investigators" by using the "FindMy" application, and that "after a short time the stolen AirPods were determined to be at the home of 1022 Wylin Court, St. Louis, MO  63135."

42.     There is no indication of the identity of any of the other investigating officers, or the identity of any of the officer(s) who were using the FindMy App.

43.     There is no indication that any investigating officers had training or knowledge regarding the accuracy of the FindMy App.

44.     There is no indication of the meaning of "at the home," that is, whether the Affiant or Defendant Officer Percich meant the App showed that the AirPods were on the street in front of the Plaintiffs' home, or whether the AirPods were within the home at that address, in the yard of that home, in the street in front of that home, or at or near a neighboring house or neighboring yard.

45.     Within the Affidavit there is no image of the FindMy map on which the police purportedly relied in determining the location of the AirPods.

46.     There is no indication whether the App showed a blue circle around any particular area, which the FindMy App sometimes shows, or, if so, the area encompassed by any such blue circle.

47.     The accuracy of the FindMy App depends on the configuration of adjoining buildings, the location of cell towers, Bluetooth connectivity, WiFi and GPS networks, and other factors.

48.     The Affidavit did not explain how the App works, what technology it uses, or establish

that it was working correctly at the time of its use.

49.    Later in the day the AirPods were found in the street in front of the Plaintiffs' home at 1022 Wylin Court.

50.    There is no evidence that anyone moved them between the morning and the time of the SWAT Team raid later in the day.

51.    In the alternative, if the App was extremely accurate the App would have showed that the AirPods were in the street in front of the house.

52.    In the alternative, if the App was moderately accurate it might conceivably, but falsely, have shown the AirPods to be inside the home, but if so that would be evidence of the inaccuracy of the App, for, as stated above, the AirPods were actually at the time in the street in front of Plaintiffs' home.

53.    The Affidavit at para. 7 states that "surveillance was initiated at 1022 Wylin Court."

54.    The Affidavit does not state what time that surveillance started.

55.    The Affidavit does not indicate any basis for believing that any items stolen with the Charger or any other items associated with the car-jacking were actually in Plaintiffs' home.

56.    Although not known by the officers at the time, just after 6:50 a.m. the eldest of the Plaintiff children, B.M.C., then age 13, was walking on Wylin Court in a normal manner toward her school bus stop.

57.    As she walked along, she had to jump out of the way because a dark-colored car sped by on Wylin Court.  That car was likely the Charger.

58.    The Affidavit has no information about the identity of the officers conducting the surveillance at 1022 Wylin Court or what those officers observed.

59. Plaintiffs' home is approximately 15 miles from the Waffle House, and there is no direct route, such as an interstate highway, between the two locations.

60. The Affidavit at para. 8 states that at 8:10 a.m. north precinct officers:

    a.     Located the Charger,

    b.     The Charger was occupied by "**a driver and four**" passengers,

    c.     The officers attempted a stop by activating lights and sirens, but

    d.     The driver sped off "at high speed."

61. The officers who located the Charger and attempted the stop are not identified.

62. The Affidavit at para. 9 states that the pursuit ended in the 1700 block of Foley Drive, (which is approximately 6 miles from Plaintiffs' home).

63. Further, the Affidavit at para. 9 states that, at that location, the Charger had crashed, two females from the vehicle were taken into custody immediately, and two males ran off.

64. The Affidavit at para. 9 also states that after these **four** individuals had abandoned the Charger, it was "unoccupied."

65. That leaves one person, the fifth person, unaccounted for.

66. The Affidavit at para. 10 states that after a foot chase officers took the two males into custody, and two pistols and a satchel belonging to one of the victims were found along the route where the two males had run away.

67. The Affidavit says nothing about a connection between those weapons and Plaintiffs' home.

68. The (obviously physically fit) officers who gave successful chase are not identified.

69. The Affidavit at para. 11 states the names and dates of birth of the two males and the two females.

70.     The Affidavit does not state the method of identification.

71.     As of March 22, 2024, per a check on case.net by personnel in undersigned counsel's office, no persons with those names has a 2023 or 2024 case pending in St. Louis County.

72.     The Affidavit at para. 12 states that detectives conducted a formal recorded video interview of one of the females.  That paragraph states that she stated on the video, in relevant part, that one of the males already in custody and another male, (as of then unidentified except as wearing a blue sweatshirt), "had relieved [the victims] of the Dodge Charger."

73.     At that paragraph the Affidavit states that the female also stated that the six of them had been together through the "overnight hours" at the "St. Louis Riverfront" and at White Castle.  That paragraph states that she provided a receipt for the "what you crave" sliders, etc. from the White Castle.

74.     The Affidavit does not identify who conducted the interview.

75.     The Affidavit at paras. 13-14 states that the female further stated that the persons in the Charger and the Kia had gone to a gas station and that they had discarded some items into a green trash can and swapped around drivers and passengers.

76.     The Affidavit at paras. 13-15 states that the detectives concluded that because the trash can was green, it was likely at a BP gas station.  The detectives then went to the nearby BP at 1790 South Florissant Road.  At that location the detectives found three backpacks containing the victims' property.  Further, the detectives viewed video surveillance footage which showed all six of the original criminals interacting with one another at the station, and then all three cars heading "northbound on South Florissant Road toward Woodstock Road."

77.    There is no statement as to whether the BP gas station or some other source provided surveillance footage, or as to the clarity of the surveillance footage.

78.    The Affidavit does not state whether the time stamp of the BP surveillance video indicated that the criminals' stop at that location was before or after surveillance had begun at 1022 Wylin Court.

79.    Woodstock Road travels east and west.  South Florissant Road travels north and south.

80.    The intersection of Woodstock Road and South Florissant Road is approximately ½ mile to the north of the BP.  Wylin Court is off Woodstock Road, approximately 1/10th of a mile east of the intersection of Woodstock Road and South Florissant Road.

81.    Many streets cross South Florissant Road north of the BP gas station at 1790 S. Florissant Road and the criminals could have taken any of those streets.

82.    There is no indication whatsoever that any detectives asked the female giving the statement about:

a.    Any association with Plaintiffs' home,

b.    The route they took from the gas station to Woodstock Road,

c.    Turning off Woodstock Road onto Wylin Court,

d.    The AirPods,

e.    Going into Plaintiffs' home,

f.    What happened to the sixth person, or

g.    Ever having had contact with anyone at Plaintiffs' home.

83.    The Affidavit does not say if the four detained subjects were released or were arrested.

84.    The Affidavit at para. 16 states that as of the writing of the Affidavit, which was time recorded at 4:41 p.m. on the same day, the "AirPods were still at 1022 Wylin Court."

85.     The Affidavit does not say how the author, Defendant Percich, knew this fact, or anything about what "at 1022 Wylin Court" meant.

86.     The Affidavit at para. 17 states that "the crime occurred through the use or threatened use of deadly force during which the suspects displayed firearms in a crime of violence." That is true.

87.     The Affidavit at para. 17 further states that "detectives seek authorization to serve this search warrant in a 'no knock' manner, if deemed appropriate by personnel assigned to the St. Louis County Police Department's Tactical Operations Unit."

88.     While the Affidavit states that the raid may be conducted by the Tactical Operations Unit, it does not state that a raid by the Tactical Operations Unit is actually a full SWAT Team Raid.

89.     A full SWAT Team Raid is overwhelming force.[2]

90.     The Affidavit at para. 17 further states that "At least one suspect remains unidentified and detectives have reason to believe that person resides at or frequents 1022 Wylin Court."

91.     The Affidavit does not explain how the detectives would have reason to believe an unidentified person resided at or frequented any particular home, particularly Plaintiffs' home.

92.     The Affidavit does not state affirmatively that the officers had information that a suspect was at 1022 Wylin Court or that unnamed officers had had 1022 Wylin Court under surveillance all day or any particular part of the day.

93.     The Affidavit at para. 18 states that "a suspect" frequently retains and stores evidence

---

[2] *Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners*, 931 F.3d 672, 692 (8th Cir. 2019), Gruender concurring.

"within his/her home."  Plaintiffs believe this reference is to a "generic" suspect.

94.    The Affidavit does not state why any of the Plaintiffs would fit this alleged behavior pattern of "a suspect."

95.    The Affidavit does not state whether there was ever any effort made to locate the Kia or the Chevrolet, and thus to locate the other criminals involved in the carjacking.

96.    The Affidavit does not state whether the officers in charge of the SWAT Team Raid communicated with the officers who had by then purportedly spent several hours conducting surveillance at 1022 Wylin Court.

97.    The Affidavit does not claim the officers had any affirmative evidence that one of the six persons who were involved in the carjacking were at 1022 Wylin Court at any time during that day.

98.    The Affidavit at para. 19 states that the Affidavit does not provide all facts known to Percich, but only enough facts to establish probable cause.

99.    The Affidavit at the third unnumbered paragraph states three words: "No Knock Authorized."

100.    Whether those words mean authorization had already been given by his superiors or something else is unknown to Plaintiffs as of this filing.

101.    In the alternative, a supervisor signed off on Percich seeking a warrant for a no knock raid, and that the supervisor knew that would be a SWAT team raid.

102.    Percich's misstatements and material omissions include but are limited to:

    a.    He actually had no reason to believe any items on his list of items ("firearms, ammunition, holsters, firearm related material") were at Plaintiffs' home.

    b.    He did not identify the other officers and detectives involved,

c.      He did not state whether or not the video surveillance footage at the Waffle House shows the carjackers displaying firearms,

d.      He did not state who reported that the carjackers had displayed firearms, and the identity of the officer who took the report,

e.      He did not state whether the words "at the home" in the Affidavit meant on the street in front of the home, in the yard of the home, or in the home.

f.      He did not state that the FindMy App for locating AirPods is not accurate and commonly places AirPods inside a house when they actually are on the street or sidewalk and vice-versa, or state anything else about any blue circle, or the overall accuracy of the FindMy App.

g.      He did not state how the FindMy App works.

h.      He did not state whether the officers who were using the FindMy App were trained in its use,

i.      He did not include any image from the App showing the location of the AirPods,

j.      He did not state what officers who conducted surveillance at 1022 Wylin Court had observed during the day,

k.      He did not state what happened to the alleged fifth person in the Charger when north county officers first located that vehicle,

l.      He did not state whether there had been any later effort to locate the Kia and the Chevrolet,

m.     He did not state whether the four subjects the unidentified officers had detained were released or arrested,

n.     He did not state whether the surveillance at 1022 Wylin Court began before or

after all six criminals were on tape at the BP, for if so, there would be no chance that one or both of the uncaptured criminals was at 1022 Wylin Court at the time of the SWAT Team Raid.

o.      He did not state whether any detectives had asked the female giving the recorded statement about:

  i.       Her group's association with Plaintiffs' home,

  ii.      Their route from the gas station to Woodstock Road,

  iii.     Turning from Woodstock Road onto Wylin court,

  iv.      The AirPods,

  v.       Going into the home, or

  vi.      Ever having had contact with anyone at the home.

p.      He did not state how he knew that at 4:41 p.m. the FindMy App still indicated that the AirPods were "at 1022 Wylin Court."

q.      He did not state whether the words "No Knock Authorized" in unnumbered paragraph three meant Percich had already received approval from his supervisor for a no knock search,

r.      He did not state whether the officers in charge of the SWAT Team Raid communicated with the officers who had by then for several hours been conducting surveillance at 1022 Wylin Court and, if so, what they reported,

s.      He did not state whether the officers had any affirmative evidence, that is, actual information as opposed to a hypothetical possibility,[3] that a suspect or any

---

[3] *Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners*, 931 F.3d 672, 682 (8th Cir. 2019).

14

weapons were at 1022 Wylin Court at any relevant time,

    t.       He did not state that a raid by the Tactical Operations Unit would actually be a full SWAT team raid, and

    u.       He did not state what portions of the Affidavit were based on his own personal knowledge and what portions of the Affidavit were based on knowledge gleaned from other officers.

103.    If one fills in the omissions with relevant information known to Percich, and also deletes the misstatements, the Affidavit would be insufficient to create probable cause for the SWAT Team Raid.[4]

104.    Officers later found the AirPods in the street in front of Plaintiffs' home in front of the trash cans.

**Warrant Itself Not Justified, Defendant Percich Misled the Court**

105.    There was no probable cause for the search warrant and had the affidavit contained complete information, the state court judge would not have approved the warrant.[5]

106.    The warrant was not supported by probable cause because there was not a fair probability that contraband or evidence of a crime would be found at the Briscoe home.[6]

107.    The warrant application was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.[7]

108.    The drafting of the defective search warrant application occurred slowly, methodically, intentionally and deliberately. This drafting process did not require or involve any split-

---

[4] *Franks v. Deleware*, 438 U.S. 154 (1978).
[5] *Franks v. Deleware*, 438 U.S. 154 (1978).
[6] *Illinois v. Gates*, 462 U.S. 213, 230 (1983)
[7] *Malley v. Briggs*, 475 U.S. 335, 345 (1986), *Mueller v. Tinkham*, 162 F.3d 999, 1003 (8th Cir. 1998), *Morris v. Lanpher*, 563 F.3d 399, 402 (8th Cir. 2009)

second decision-making.

109.    Defendant Officer Percich misled the court when he drafted the search warrant
        application.

110.    Defendant Officer Percich intentionally or recklessly included false statements and
        material omissions in the affidavit.[8]

111.    Supplemented by the omitted information and correcting false statements, the Affidavit
        would not have been sufficient to support a finding of probable cause.[9]

**The SWAT Team Raid**

112.    Very early the morning of the raid, Lindell had returned from his professional job driving
        a truck.

113.    The truck is a full size over the road commercial truck.  He had dropped off the trailer
        elsewhere and so had "bob-tailed" home.

114.    Lindell spent much of the day in the truck relaxing.

115.    St. Louis County executed a SWAT Team Raid at approximately 6:30 p.m.

116.    On information and belief Defendant Percich was the leader of the SWAT Team Raid.

117.    There were numerous officers in full combat regalia.

118.    The officers were heavily armed with military style weapons.

119.    The officers exited their military style van and approached the house's two exterior doors
        with shields in front of them and their weapons drawn.

120.    The officer who went to the front door knocked three times and shouted words to the

---

[8] *United States v. Ozar,* 50 F.3d 1440, 1443 (8th Cir.1995), *Morris v. Lanpher*, 563 F.3d 399,
403 (8th Cir. 2009).
[9] *Riehm v. Engelking,* 538 F.3d 952, 966 (8th Cir.2008), *Morris v. Lanpher*, 563 F.3d 399, 403
(8th Cir. 2009).

effect of "St. Louis County police executing a search warrant.  Come to the front door. Do it now."

121.  After approximately 25 seconds of knocking and shouting by the officers no one had come to the door and officers used a battering ram to break through Plaintiffs' front door.

122.  At the start of the raid Brittany was in the house with three of the children.

123.  After the officers burst through the front door, they trained their guns on Brittany.

124.  Brittany was crying and asked "What is going on?"

125.  Brittany told the officers she had a three-month old baby inside.

126.  The officers forced Brittany to exit the house leaving her crying baby inside.

127.  Brittany was wearing only her panties and an underwear type top when the raid started, and the officers forced her to walk out to the front yard in that condition.

128.  Lindell and two of the children were in the truck at the time.

129.  Officers pointed large rifles at Lindell.  He told the officers he had children in the truck.

130.  Officers demanded that Lindell and the two children exit the truck.

131.  The Officers were screaming commands.

132.  Officers pointed guns at Lindell and Brittany.

133.  The officers did not at all times keep their guns pointed downward so that no innocent person would be harmed.

134.  The family was detained from 6:30 p.m. to 7:00 p.m., during which time they had to remain standing on the sidewalk.

135.  After the baby had been crying alone in the house for more than four minutes one of the officers, in full combat regalia, picked the baby up off a bed and brought the baby outside.

136.   The officer brought the baby out wrapped in a blanket.

137.   Brittany wrapped the blanket around herself and the baby.

138.   Brittany was terrified for her baby while she was separated from the baby.

139.   Brittany asked the police whether she could sit down outside and they told her no.

140.   By then Brittany had been standing in the front yard in her underwear for approximately seven minutes.

141.   At the start of the raid the house was in a clean orderly condition, and any reasonable officer would have promptly known that it was an innocent family's home and not the sort of place inhabited by drug crazed criminals.

142.   Heavily armed members of the SWAT team ransacked the house.

143.   The SWAT team punched a hole larger than a basketball in the bedroom drywall and broke through a drop ceiling in the ceiling.  The officers ransacked the drawers and turned them over.  The officers left the house in disarray.

144.   The SWAT Team Raid was undertaken in a rapid and dangerous manner.

145.   There are videos of the raid from Plaintiffs' ring camera and from cameras worn by the officers.

146.   The SWAT Team Raid terrorized the Plaintiffs, including both the two adults and their children, and the recklessly conducted raid could have resulted in their injuries and/or deaths.

147.   The family was terrorized and traumatized by this ordeal, which lasted approximately thirty minutes.

148.   Neighbors witnessed this incident, which caused the family humiliation and embarrassment.

149.   The officers eventually realized that the Briscoe family had nothing to do with the Waffle House carjacking.

150.   On inference, when an officer found the AirPods in the street, the officers knew, (as they already should have known) that Plaintiffs had nothing to do with the carjacking.

151.   Only after realizing that this search was unjustified did the police give Lindell and Brittany a copy of the search warrant.

152.   The officers eventually released the family from detention and left.

153.   The Briscoe family did not possess any stolen property or contraband.

154.   The officers did not take any of the Briscoe's personal property.

### Use of SWAT Itself Not Reasonable or Justified

155.   To the extent there was an internal risk assessment by St. Louis County to justify the SWAT Team Raid, it was mishandled, because although Lindell had a prior record of incarceration from a conviction 17  years earlier, he had paid his dues to society, and had been out of prison for many years, and by the time of this incident, he was a normal, job-holding, family man.

156.   In the alternative before the raid started the officers did not know who lived at the Briscoe's home.

157.   This would explain an officer early in the raid asking Brittany for Lindell's name.

158.   Similarly, although Brittany had also had a prior offense, by the time of the raid she was a law abiding mother and citizen.

159.   Defendants unreasonably and unnecessarily deployed overwhelming SWAT team force in order to execute this search warrant.  Defendants' excessive and dangerous use of force was allowed and invited by the current policy, custom and procedure of St. Louis

County, and it resulted in serious violations of Plaintiffs' civil rights.

160.   St. Louis County slowly, methodically, intentionally and deliberately put into place its SWAT team policies, procedures and customs that invited this excessive use of force.

161.   The decision to use SWAT in this situation involved no split-second decision making.

162.   None of the children have any material criminal history.

163.   St. Louis County had no evidence the Briscoe family had any weapons.

164.   Based on the limited evidence of AirPods from the crime only in the vicinity of Plaintiffs' house, St. Louis County Police had no information that Plaintiffs would pose any immediate threat to their safety.[10]

165.   The use of SWAT in this case was unreasonable and unjustified.[11]

166.   A reasonable opportunity for discovery will reveal additional details regarding the St. Louis County Police's procedures for determining whether to use SWAT in any particular situation.

167.   It is unreasonable to use SWAT for every situation in which there is some risk to the officers, because an appropriate balance requires a consideration of the rights of citizens not to be exposed to overwhelming force.

168.   St. Louis County has a continuing, widespread, and persistent pattern of routinely using SWAT when it is not justified.[12]

---

[10] *Despain v. Louisville Metro. Gov't*, No. 3:14-CV-P602-CHB, 2021 WL 3699425, at *5 (W.D. Ky. Aug. 19, 2021)`
[11] The reasonableness of the method used to execute a search warrant must be evaluated on a fact-dependent, case-by-case basis. *U.S. v. Banks*, 540 U.S. 31, 36 (2003).  See also, *Walker v. St. Louis, Missouri, City of*, No. 4:15 CV 1254 CDP, 2016 WL 7474989, at *6–7 (E.D. Mo. Dec. 29, 2016)
[12] *Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners*, 931 F.3d 672, 693 (8th Cir. 2019), Kelly concurring.

169.     Use of SWAT when not justified contributes to citizen mistrust of the police, including

         causing citizens to cease cooperating with the police to solve crimes, including horrific

         murders.

**Method of Use of SWAT was Excessive Force**

170.     The method of use of the SWAT Team was an unreasonable use of force because the

         circumstances provided no safety concern, viewed objectively, to justify the use of

         SWAT[13] in the following manner:

         a.     Breaking down the door,

         b.     Showing up with full combat regalia, (although officers having guns while

                executing a search is not unreasonable if the search itself is reasonable, balancing

                the nature of the intrusion against the government interest justifying the intrusion,

                [14]),

         c.     Pointing guns at Plaintiffs, (although officers detaining subjects while executing a

                search is not unreasonable if the search itself is reasonable, balancing the nature

                of the intrusion against the government interest justifying the intrusion[15]),

         d.     Yelling at Plaintiffs, or

         e.     In any other way terrorizing the Plaintiffs.

171.     The officers should have called off the raid at the very beginning, when it was obvious

         that this was an innocent middle-class family.

---

[13] *Ashcroft v. al–Kidd,* 563 U.S. 731 (2011), *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 933 (8th Cir. 2016).
[14] *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 933 (8th Cir. 2016), with the government interests being preventing flight, minimizing risk to officers, and conducting an orderly search.
[15] *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 933 (8th Cir. 2016), with the government interests being preventing flight, minimizing risk to officers, and conducting an orderly search.

172.    On inference, Defendant Officer Percich was responsible for the tactical decisions made in the course of the SWAT Team Raid.

### Door Unfixed by County, Landlord Repaired Damage

173.    The day after the SWAT Team Raid, on May 27, 2023, Lindell wrote an email to St. Louis County Detective Justin Adams, who had been at the scene, demanding that the County fix the front door which the SWAT team had broken down during the raid.

174.    The next day Detective Adams agreed that St. Louis County would fix the door and asked Lindell to contact the County to have the work done.

175.    Lindell contacted the County to have the work done.

176.    St. Louis County never did the work.

177.    A few months later Plaintiffs' Landlord fixed all the damage at no cost to Plaintiffs.

178.    In the meantime, the Plaintiffs had to live with a damaged front door and the other damage.

179.    St. Louis County also never fixed the holes they punched in the drywall or in the basement ceiling.

### DAMAGES

### Embarrassment, Reputational Harm,
### Loss of Liberty, Garden Variety Emotional Distress, Distrust of Law Enforcement,
### Loss of Feeling of Safety in the Home

180.    During their detention Plaintiffs lost their liberty.

181.    During the incident Plaintiffs were humiliated in front of their neighbors.

182.    The incident was on the news, and therefore in the immediate aftermath of the incident, Plaintiffs were humiliated in the eyes of their friends and acquaintances, and Plaintiffs assumed their reputations were harmed.  Plaintiffs suffered unwarranted reputational

damage, and garden variety emotional distress.

183. A representative of St. Louis County made public statements after the incident was over, asserting that Plaintiffs remained suspects related to the carjacking, even though at that time Plaintiffs were no longer suspects. Those statements caused Plaintiffs additional garden variety emotional suffering and also additional unwarranted reputational damage.

184. Plaintiffs lived for several months with a damaged house.

185. All Plaintiffs were deprived of their liberty for a period of time.

186. Within the context of the Fourth Amendment all Plaintiffs were seized.[16]

187. All Plaintiffs suffered and continue to suffer garden-variety emotional distress.

188. None of the Plaintiffs suffered physical injury.

189. As a result of the incident all Plaintiffs distrust law enforcement.

190. As a result of the incident all Plaintiffs no longer have a feeling of security in their home.

## No Special Damages

191. Plaintiffs have no special damages.

## SUNSHINE ACT REQUESTS

192. On September 14, 2023, Plaintiffs (through their undersigned attorneys) submitted a Missouri Sunshine Request to St. Louis County, seeking documents related to the above-described search warrant.

193. More specifically, in Sunshine request 23-15314, Plaintiffs requested the following documents from St. Louis County

    A.    Any and all documents relating to the May 26, 2023 search warrant of the St. Louis County Policy Department pertaining to the home of Mr. Briscoe at 1022 Wylin Court, St. Louis County, MO 63135:

---

[16] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001)

This request <u>includes any documents related to the above search warrant</u> including, but not limited to:

B.      A full copy of the search warrant, any attachments to the search warrant and any supporting documents to that search warrant;

C.      Any police or incident reports;

D.      Any investigative reports;

E.      Any body-camera, taser camera, or dash camera footage;

F.      Any dispatch records;

G.      Any witness statements;

H.      Any arrest records; and

I.      Any statements made in any form by any St. Louis County employee.

194.   Since submitting this request, St. Louis County has produced body cam videos of the raid, but none of the other information requested in Sunshine request 23-15314.

195.   Plaintiffs, through their attorney has sent electronic messages to St. Louis County at least seven times, with no indication that St. Louis County would produce most of the items requested and no indication of when such items might be produced.

196.   Instead, St. Louis County responded to these numerous requests indicating that it would take more time.

197.   On December 20, 2023, St. Louis County indicated:



Despite this promise, St. Louis County did not provide Plaintiff with any records on January 5, 2024.

199. On January 25, 2024, Plaintiffs' undersigned counsel issued a "Hammer Letter," stating;

> I was supposed to receive our response to our sunshine requests many times already. The most recent due date was Jan 5. I have heard nothing from you or your office since then. This has put my client in a difficult spot.
> Please immediately confirm that you will be able to produce all responsive documents on or before February 2, 2024. If we do not receive all responsive documents on or before that date, we will be forced to file suit to enforce our sunshine request.
>
> **YOU ARE HEREBY ADVISED OF YOUR DUTY TO RESPOND ON A TIMELY BASIS TO THIS REQUEST. A FAILURE TO RESPOND WILL BE MET BY A LAWSUIT SEEKING DAMAGES FOR A KNOWING AND/OR PURPOSEFUL VIOLATION OF THE SUNSHINE ACT.**
>
> Erich Vieth

200. In response to the Hammer Letter St. Louis County did not produce the requested information.

201. On inference, St. Louis County did not respond meaningfully to the Sunshine Act request because the information would have been disfavorable to its legal position in this matter.

202. Because of the disfavorable nature of the information and the possibility of resulting negative effect on St. Louis County's legal position, the failure to respond was at least knowing.

203. In the alternative, for the same reason the failure to respond was purposeful.

### POLICY – MONELL LIABILITY

204. It was and is the policy of St. Louis County to conduct SWAT Team Raids when not justified by the circumstances.

205. The policy is attributable to the County by constructive knowledge, that is, the County itself was aware of the policy because St. Louis County police officers and high level St. Louis County supervisors were acting on the policy.

206. The policy is in place despite that fact that a SWAT Team Raid is overwhelming force,

and only in the most extraordinarily dangerous situations is overwhelming force required.

207.   The use of a SWAT Team Raid in other than the most extraordinarily dangerous situations is not reasonable under the Fourth Amendment.

208.   On inference St. Louis County uses the SWAT Team in non-extraordinarily dangerous situations in order to justify the existence of the unit, and to give the unit practice on the public, at the expense of the public being exposed to excessive force.

209.   That policy caused Plaintiffs' damages.[17]

210.   If the Sunshine Act violations had not occurred and St. Louis County had responded meaningfully, the above allegations would be supported with more direct facts, and/or discovery will provide additional facts in support of the allegations.

211.   In the alternative, St. Louis County did not follow its own policies regarding SWAT Team Raids.

### ATTORNEY'S FEES AND COSTS

212.   In pursuit of their § 1983 civil rights claims, and in pursuit of their Sunshine Act claim Plaintiffs are incurring reasonable attorney's fees, taxable costs, and non-taxable costs, each compensable respectively under 42 U.S.C. § 1988 and RSMo. 610.027.

### COUNT I
### DAMAGES
### UNREASONABLE SEARCH BASED ON INACCURATE AFFIDAVIT
### ALL PLAINTIFFS AGAINST DEFENDANT PERCICH

213.   Plaintiffs incorporate all prior paragraphs.

214.   *First,* Defendant Percich made material omissions and material misstatements in his affidavit in support of his application for a search warrant, and

---

[17] *Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1094 (8th Cir. 2004), citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

215. *Second,* if Defendant Percich had accurately and reasonably stated the facts known to him in the totality of the circumstances the court would not have approved the search warrant application,[18] and

216. *Third,* as a direct result, Plaintiffs were damaged.[19]

### Prayer

WHEREFORE each Plaintiff prays the Court to enter judgment against Defendant Joseph Percich in his individual capacity for unreasonable search, award each Plaintiff compensatory damages, award Plaintiffs taxable costs, non-taxable costs, and award reasonable statutory attorney's fees under 42 U.S.C. § 1988, and to grant such other relief as may be just, meet and reasonable.

### COUNT II
### DAMAGES
### SWAT WAS UNREASONABLE USE OF FORCE
### ALL PLAINTIFFS AGAINST DEFENDANT PERCICH

217. Plaintiffs incorporate all prior paragraphs.

218. *First,* Defendant Percich employed a SWAT team at Plaintiffs' home when investigating the carjacking, and

219. *Second,* the use of SWAT at Plaintiffs' home was excessive because it was not reasonably necessary in order to investigate the carjacking, and

---

[18] *Franks v. Deleware*, 438 U.S. 154 (1978).

[19] Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2020), Instruction No. 4.04.  A warrant is supported by probable cause if there is a " 'fair probability that contraband or evidence of a crime will be found in the place to be searched." ' *United States v. Turner*, 431 F.3d 332, 336 (8th Cir.2005), (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983). Whether probable cause exists is determined based on the totality of the circumstances and with a common-sense approach. *United States v. Carter*, 413 F.3d 712, 714 (8th Cir.2005).

220.   *Third,* as a direct result, Plaintiffs were damaged.[20]

### Prayer

WHEREFORE each Plaintiff prays the Court to enter judgment against Defendant Joseph Percich in his individual capacity for excessive force, award each Plaintiff compensatory damages, award Plaintiffs taxable costs, non-taxable costs, and award reasonable statutory attorney's fees under 42 U.S.C. § 1988, and to grant such other relief as may be just, meet and reasonable.

### COUNT III
### DAMAGES
### UNREASONABLE USE OF FORCE IN METHOD OF USE OF SWAT
### ALL PLAINTIFFS AGAINST DEFENDANT PERCICH

221.   Plaintiffs incorporate all prior paragraphs.

222.   *First,* Defendant Percich's SWAT team pointed guns at the adults, had on combat regalia, screamed, broke down door, and caused disarray of Plaintiffs' property in the house, all while at Plaintiffs' home and while investigating the carjacking, and

223.   *Second,* that conduct was excessive because it was not reasonably necessary in order to investigate the carjacking,[21] and

224.   *Third,* as a direct result, Plaintiffs were damaged.[22]

### Prayer

WHEREFORE each Plaintiff prays the Court to enter judgment against Defendant Joseph Percich in his individual capacity for excessive force, award each Plaintiff compensatory

---

[20] Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2020), Instruction No. 4.04
[21] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001)
[22] Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2020), Instruction No. 4.04

damages, award Plaintiffs taxable costs, non-taxable costs, and award reasonable statutory

attorney's fees under 42 U.S.C. § 1988, and to grant such other relief as may be just, meet and

reasonable.

**COUNT IV**
**DAMAGES**
**UNREASONABLE SEIZURE**
**ALL PLAINTIFFS AGAINST DEFENDANT PERCICH**

225.    Plaintiffs incorporate all prior paragraphs.

226.    *First,* Defendant Percich seized each Plaintiff when investigating the carjacking, and

227.    *Second,* the seizures were unreasonable because it was not reasonably necessary in order

         to investigate the carjacking, and

228.    *Third,* as a direct result, Plaintiffs were damaged.[23]

**Prayer**

        WHEREFORE each Plaintiff prays the Court to enter judgment against Defendant Joseph

Percich in his individual capacity for unreasonable detention; award each Plaintiff compensatory

damages, award Plaintiffs taxable costs, non-taxable costs, and award reasonable statutory

attorney's fees under 42 U.S.C. § 1988, and to grant such other relief as may be just, meet and

reasonable.

**COUNT V**
**SWAT TEAM RAID POLICY**
**MONELL LIABILITY**
**ALL PLAINTIFFS AGAINST DEFENDANT ST. LOUIS COUNTY**

229.    Plaintiffs incorporate all prior paragraphs.

230.    *First*, the use of SWAT was not justified under the circumstances of this case, and.

---

[23] Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2020), Instruction No. 4.04

231. *Second*, it is the policy of St. Louis County to use SWAT in circumstances when it is not justified,

232. *Second, in the alternative*, St. Louis County did not follow its own policies in choosing to use SWAT in these circumstances, and

233. *Third*, St. Louis County's policies are attributable to the County through actual or constructive knowledge.

234. *Fourth,* as a direct result, Plaintiffs were damaged.[24]

WHEREFORE Plaintiffs pray the Court enter judgment against Defendant St. Louis County and award Plaintiffs compensatory damages, award Plaintiffs taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988, and grant such other relief as may be just, meet and reasonable.

## COUNT VI
## RSMO. 610.010 STATE LAW CLAIM
## AGAINST ST. LOUIS COUNTY
## FOR SUNSHINE ACT VIOLATION

235. Plaintiffs incorporate all prior paragraphs.

236. *First*, Plaintiffs, acting through their attorney, made a lawful Sunshine Act request to Defendant St. Louis County regarding the SWAT Team Raid,

237. *Second*, Defendant St. Louis County never responded meaningfully to the Sunshine Act request,

238. *Third*, St. Louis County officials were aware of their duty to respond to a proper Sunshine Act request,

---

[24] Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2020), Instruction No. 4.04, *Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1094 (8th Cir. 2004), citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

239.    In the alternative, *Fourth,* in failing to meaningfully respond St. Louis County knowingly

        violated the Sunshine Act,

240.    In the alternative, *Fourth*, in failing to meaningfully respond St. Louis County

        purposefully violated the Sunshine Act,

241.    In the alternative, *Fifth*, for this knowing violation Plaintiffs are entitled to a civil penalty

        of $1,000.00 and the court may order attorney's fees and costs.

242.    In the alternative, *Fifth*, for this purposeful violation Plaintiffs are entitled to a civil

        penalty of $5,000.00 plus attorney's fees and costs.

243.    Although the meaning of the terms "knowing" and "purposeful" is a question of law,

        "[w]hether the conduct of the city brings it within the scope of the statutory definitions of

        knowing and purposeful conduct is a question of fact.[25]

        WHEREFORE Plaintiffs pray the Court enter judgment against Defendant St. Louis

County, declare that the records requested by them, through counsel, are open records under the

Sunshine Law; find that St. Louis County purposefully, or at least knowingly violated the

Sunshine Law; order St. Louis County to permit Plaintiffs' counsel  to inspect and copy records

responsive to their Sunshine Law Request; and order St. Louis County to pay Plaintiffs'

attorneys' fees and costs, grant a civil penalty, and such other and further relief as the Court

deems just and proper.


Respectfully Submitted,

Attorneys for Plaintiffs

  /s/ W. Bevis Schock                      /s/ Erich Vieth
W. Bevis Schock, 32551MO           Erich Vieth, 29850 MO
7777 Bonhomme Ave., Ste. 1300    20 South Sarah Street

---

[25] *Wyrick v. Henry*, 592 S.W.3d 47, 58 (Mo. Ct. App. 2019)

St. Louis, MO  63105                     St. Louis, MO 63108
wbschock@schocklaw.com                   erichviethattorney@gmail.com
Voice:  314-726-2322                     Voice: (314) 604-3454
Fax:     314-721-1698                    Fax: (314) 310-1181