# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

LINDELL BRISCOE, *et al.*,                    )
                                            )
        Plaintiffs,                                )
                                            )
     vs.                                           )          Case No. 4:24-cv-440-MTS
                                            )
ST. LOUIS COUNTY, *et al.*,                    )
                                            )
        Defendants.                                )

## MEMORANDUM AND ORDER

Before the Court is Defendants St. Louis County and Detective Joseph Percich (collectively, "Defendants")'s Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b), Doc. [10].  Plaintiffs Lindell Briscoe, Brittany Arlesia Shamily, and Brittany Arlesia Shamily as next friend of her five minor children (collectively, "Plaintiffs") filed their opposition, Doc. [14], and Defendants replied, Doc. [17].  For the reasons that follow, the Court will grant Defendants' Motion.

## Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  The purpose of such a motion is to test the legal sufficiency of a complaint.  When considering a Rule 12(b)(6) motion, the Court assumes a complaint's factual allegations are true and makes all reasonable inferences in favor of the nonmoving party, but the Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts."  *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).  Indeed, the complaint "must allege more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements'" and instead must "allege sufficient

facts that, taken as true, 'state a claim to relief that is plausible on its face.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The plausibility of a complaint turns on whether the facts alleged allow a court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

## Background[1]

This 42 U.S.C. § 1983 action arises out of the search of Plaintiffs' home at 1022 Wylin Court, conducted by the St. Louis County Tactical Operations Unit or, colloquially, the SWAT team. Doc. [1] at 1, ¶¶ 87–88. Officers performed the search pursuant to a warrant sought by Detective Percich and issued by the Honorable Megan Julian, judge of the Twenty-First Judicial Circuit of Missouri. Doc. [1-5] at 1. The warrant authorized a search of Plaintiffs' home for stolen property, firearms, and other evidence related to a carjacking that occurred earlier that day. *Id.* ¶ 30. Judge Julian signed the warrant upon review of a nineteen-paragraph affidavit submitted by Detective Percich, explaining the basis for the search. *Id.* ¶ 28. Because Detective Percich's statements in his affidavit are crucial to resolving this motion, the Court recites the relevant portions of the affidavit below.

1. This affiant . . . has been a St. Louis County Police Officer for over sixteen years, the last eleven assigned as a detective to the Bureau of Crimes Against Persons. . . . Your affiant has had vast specialized training regarding the investigation of violent crime.

---

[1] The Court accepts as true the factual allegations in Plaintiffs' Complaint. Although courts generally cannot consider matters outside of the pleadings when ruling on a Rule 12 motion to dismiss, *see* Fed. R. Civ. P. 12(d), a court "may consider documents attached to the complaint and matters of public and administrative record referenced in the complaint." *Owen v. General Motors Corp.*, 533 F.3d 913, 918 (8th Cir. 2008). This includes "exhibits attached to the complaint whose authenticity is unquestioned." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). Here, Plaintiffs attached as exhibits Defendant Percich's warrant application, Doc. [1-3], his accompanying affidavit, Doc. [1-4], and the search warrant that was ultimately issued, Doc. [1-5]. Accordingly, the Court will consider these documents when ruling on Defendants' Motion. *See Kiesling v. Holladay*, 859 F. 3d 529, 533 (8th Cir. 2017) (construing a search warrant and warrant affidavit as "part of the complaint" when attached as exhibits for the purpose of evaluating a motion to dismiss).

2.  On Friday, May 26, 2023, at approximately 6:26 AM, police officers . . . responded to [a St. Louis County] Waffle House . . . for a report of a First Degree Robbery/Vehicle Hijacking.[2]

3.  While the victims ate, a black male in a light blue hooded sweatshirt entered the restaurant and [sat] at the counter.  The subject then returned to two vehicles in the parking lot.  Those vehicles were described as a white Kia passenger car and a silver Chevrolet passenger car.

4.  After breakfast, the victims exited the business and entered their vehicle, described as a 2021 Dodge Charger, black in color.  The victims were approached by two masked black male suspects.  It was reported both suspects displayed firearms, with at least one equipped with a drum magazine.  Both suspects provided verbal directives to the victims to exit the vehicle. The suspects entered the vehicle and departed the scene.

5.  Video surveillance footage revealed the suspects arrived in the aforementioned silver and white passenger cars. One suspect was dressed in a red hooded sweatshirt.  The suspects take possession of the vehicle and flee.

6.  A witness and friend to the victims . . . reported his Apple AirPods were inside the Dodge Charger at the time of the vehicle hijacking.  [He] assisted investigators by tracking the Apple AirPods using Apple's "Find My" application.  After a short time, the stolen AirPods were determined to be at the residence of 1022 Wylin Court.

7.  Surveillance was initiated at 1022 Wylin Court.

8.  At 8:10 AM . . . patrol officers . . . located the stolen Dodge Charger. . . .  A vehicle pursuit was initiated.

9.  [When the pursuit culminated,] [t]wo males abandoned the vehicle and fled on foot.  Two females also abandoned the vehicle but were immediately taken into custody.  The unoccupied stolen Dodge Charger then struck the front of a marked police vehicle.

---

2 In Missouri, as relevant here, "[a] person commits the offense of robbery in the first degree if he or she forcibly steals property and in the course thereof, he or she, or another participant in the offense . . . [i]s armed with a deadly weapon; or . . . [u]ses  or threatens the immediate use of a dangerous instrument against any person."  Mo. Rev. Stat. § 570.023. Additionally, "[a] person commits the offense of vehicle hijacking when he or she knowingly uses or threatens the use of physical force upon another person to seize or attempt to seize possession or control of a vehicle . . . from the immediate possession or control of another person.  *Id.* § 570.027.

10. Police officers initiated a foot chase of the two male suspects. Both were taken into custody. . . . In the path of the foot chase, police officers located two pistols with drum magazines and a satchel containing the victim's property.

11. The driver of the Dodge Charger was positively identified as Carlos Strickland Jr. . . . while a passenger was identified as Jeremiah Ewing. . . . Jeremiah was dressed in a red sweatsuit. It appeared as if Carlos disrobed himself of a gray hooded sweatshirt at the time of the foot chase.

12. Detectives conducted a formal video recorded interview of Jardyn Williams, [one of the female passengers]. She reported being [present] with . . . the above named males, along with two other unknown males, near the St. Louis Riverfront throughout the overnight hours. . . . She reported the group . . . proceeded to Waffle House. Jardyn reported the male in the red sweatshirt, known to investigators as Jeremiah Ewing, and the male in the blue sweatshirt, whose identity remained unknown, approached the victims and relieved them of the Dodge Charger.

13. [The rest of her group] followed behind the Dodge Charger until reaching a gas station in/near the City of Normandy. While at the gas station, [she] reported the suspects discarded several backpacks from the victim's Dodge Charger into a green trash can near the gas pumps. Based upon the description of the trash can, detectives believed the group stopped at a BP gas station.

14. After departing the gas station, the group separated.

15. Detectives responded to the BP gas station at 1790 S. Florissant Road and located three backpacks containing property associated with the robbery victims. The items were seized as evidence. Video surveillance footage revealed three vehicles, the Dodge Charger, white Kia and silver Chevrolet arrived and departed in tandem. The occupants of the vehicles appeared to communicate with one another. The vehicles were last seen departing the parking lot northbound on S. Florissant Road, toward Woodstock Road.

16. As of this writing, information gleaned from Apple's "Find My" application revealed the stolen Apple AirPods were still at 1022 Wylin Court. The address in question is located a short distance from the intersection of S. Florissant Road and Woodstock Road.

17. The vehicle hijacking described above occurred through the use or threatened use of deadly force during which the suspects displayed firearms in a crime of violence. At least one suspect remains unidentified and detectives have reason to believe that person resides at or frequents 1022 Wylin Court. As a result,

detectives seek authorization to serve this search warrant in a "no knock" manner, if deemed appropriate by personnel assigned to the St. Louis County Police Department's Tactical Operations Unit.

18. Through training and experience, your affiant is aware evidence of criminal offenses is frequently retained by the suspect and stored within his/her residence.

19. Because this affidavit is being submitted for the limited purpose of securing a search warrant, your affiant has not included each and every fact known to me concerning this investigation. Rather, only the facts that are believed to be necessary to establish probable cause are stated above.

Doc. [1-4] at 1–3.

Based on these statements, Judge Julian issued a no-knock warrant authorizing officers to search the residence at 1022 Wylin Court for "firearms, ammunition, holsters, [and] firearm related material" as well as "cellular devices, receipts, documentations, writing, clothing, video recording devices, [and] stolen/personal property" related to the earlier carjacking. Doc. [1-5] at 1. Tactical Operations Unit officers executed the warrant that same evening. Doc. [1] ¶ 115. Plaintiffs allege, on information and belief, that Detective Percich was the leader of the Tactical Unit operation and was responsible for the tactical decisions made during the search. *Id.* ¶¶ 116, 172

Numerous officers dressed in "combat regalia" and "heavily armed with military style weapons" arrived at Plaintiffs' home. *Id.* ¶¶ 117–18. The officers approached the home's two exterior doors with shields and weapons drawn. *Id.* ¶ 119. Despite the no-knock authorization, officers knocked at the door and announced their presence. *Id.* ¶ 120. After approximately twenty-five seconds of knocking and shouting, they eventually used a battering ram to break through the door. *Id.* ¶ 121. After entry, the officers trained their guns on Plaintiff Brittany Shamily. *Id.* ¶ 123. They ordered her to exit the home immediately, leaving her three-month-old baby inside. *Id.* ¶ 126. She was forced to walk out into the front yard dressed in a top and her underwear. *Id.* ¶ 127.

As those events unfolded, Plaintiff Lindell Briscoe was sitting in a commercial truck parked in the driveway. *Id.* ¶ 113, 128. He was accompanied by two children. *Id.* ¶ 128. Officers approached the truck, pointed their guns at Lindell, and ordered him and the children to exit the vehicle. *Id.* ¶ 130. The family was detained on the sidewalk in front of their home. *Id.* ¶ 134. After four or five minutes, a Tactical Operations Unit officer reunited Plaintiff Shamily with her baby. *Id.* ¶¶ 135–36. At that time, she was able to wrap a blanket around both herself and the infant. *Id.* ¶ 137. In total, officers detained the family for approximately thirty minutes during the search. *Id.* ¶ 134.

The officers left Plaintiffs' home in disarray. *Id.* ¶ 143. They "punched a hole larger than a basketball in the bedroom drywall," broke through a drop ceiling, and turned over the drawers. *Id.* No stolen property or contraband was found inside. *Id.* ¶ 153. Officers eventually located the stolen AirPods near trash cans on the street in front of Plaintiffs' home. *Id.* ¶ 104. Realizing that the family had no connection to the carjacking earlier that day, the officers released them from detention and left the scene. *Id.* ¶ 152.

On September 14, 2023, Plaintiffs submitted a Missouri Sunshine Act Request to St. Louis County for documents related to the search of their home. *Id.* ¶ 192; *see* Mo. Rev. Stat. §§ 610.010–26. Their request sought a copy of the warrant and its attachments, police investigative reports, incident reports, body-camera or dash-camera footage, dispatch records, witness statements, and statements made by County employees. *Id.* ¶ 193. Through their attorney, Plaintiffs followed up with St. Louis County seven times regarding their request. *Id.* ¶ 195. Although St. Louis County provided body-cam footage of the search, the documentary requests went unfulfilled. The County responded on December 20, 2023, explaining that it needed more time to respond fully, and it expected to do so on January 05, 2024. *Id.* ¶ 197–98. When Plaintiffs

received no response, Plaintiffs' counsel sent a demand letter seeking documents no later than February 02, 2024, and threatening litigation if the County did not comply.  *Id.* ¶ 199.  The County made no production in response to the demand letter.

In response to the above, Plaintiffs initiated this lawsuit against St. Louis County and Detective Percich in his individual capacity.  Plaintiffs' thirty-one-page Complaint lists six counts, including five for violations of their constitutional rights pursuant to 42 U.S.C. § 1983.  More specifically, they assert four claims against Detective Percich for "Unreasonable Search Based on Inaccurate Affidavit," or a *Franks*[3] violation (Count I); Excessive Force regarding the decision to authorize a SWAT team (Count II); Excessive Force regarding the conduct of the SWAT team (Count III), and Unreasonable Seizure (Count IV).  Doc. [1] 26–39.  Plaintiffs also assert a claim for municipal liability against St. Louis County ("the County") (Count V), alleging an unconstitutional "SWAT Team Raid Policy."  Finally, Plaintiffs assert a Missouri Sunshine Act claim against the County, pursuant to Mo. Rev. Stat. § 610.027, for its knowing and purposeful refusal to respond to Plaintiffs' document request. (Count VI).  Defendants move to dismiss each Count.  Doc. [10].

## Discussion

### I.    Section 1983 Claims

Section 1983 provides a federal cause of action against officials acting under color of state law for damages caused by violations of federal constitutional or statutory rights.  42 U.S.C. § 1983.  In response to such claims, an individual official can assert the defense of qualified immunity, which provides immunity from suit, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), "insofar as [an official's] conduct does not violate clearly established statutory or constitutional

---

[3] *Franks v. Delaware*,  438 U.S. 154, 171–72 (1978)

rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013).

"To overcome qualified immunity at the motion to dismiss stage, a plaintiff 'must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Watkins v. City of St. Louis*, 102 F.4th 947, 951 (8th Cir. 2024) (quoting *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020)). To be clearly established, the law at the time of the officer's conduct must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Mogard v. City of Milbank*, 932 F.3d 1184, 1188 (8th Cir. 2019) (citation omitted).

## A. Detective Percich is entitled to qualified immunity on Count I because Plaintiffs have failed to plead facts showing that Detective Percich committed a *Franks* violation.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In addition, warrants must be supported by probable cause. *Id.* Ordinarily, "getting a warrant from a neutral magistrate is a clear indication that an officer has acted in an objectively reasonable manner." *Hartman v. Bowles*, 39 F.4th 544, 546 (8th Cir. 2022) (per curiam) (cleaned up). However, as first held in *Franks v. Delaware*, an officer violates the Fourth Amendment if he or she intentionally or recklessly makes a false statement in the warrant affidavit and the "remaining content" in the affidavit "is insufficient to establish probable cause." *Davis v. City of Little Rock*, 122 F.4th 326, 330 (8th Cir. 2024). Relatedly, a Fourth Amendment violation occurs when an officer "[i]ntentionally or recklessly omit[s] key facts" when applying for a warrant and "the

affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Hartman*, 39 F.4th at 546 (citing *Franks*, 438 U.S. at 155–56).

Taken together, to prevail on a *Franks* challenge, a § 1983 plaintiff must demonstrate

(1) the affiant officer knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement in, or omitted information from, the affidavit in support of the warrant; and (2) the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented.

*United States v. Smith*, 715 F.3d 1110, 1118 (8th Cir. 2013); *accord Estate of Nash v. Folsom*, 92 F.4th 746, 754 (8th Cir. 2024) (Section 1983 action).

"A statement in an affidavit must be truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Davis*, 122 F.4th at 330 (internal quotations omitted). This standard is satisfied "if the affiant had a reasonable basis for the conclusion." *Id.* (cleaned up). Recklessness "may be inferred from the fact of omission of information from an affidavit . . . [that] would have been 'clearly critical' to the finding of probable cause." *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986).

The probable cause determination is therefore crucial when assessing a *Franks* challenge. "Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Z.J. by & through Jones v. Kan. City Bd. of Police Comm'rs*, 931 F.3d 672, 686 (8th Cir. 2019). "[T]here must be evidence of a nexus between the contraband and the place to be searched." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). Such a nexus may be reasonably inferred given all the circumstances, *see id.*, and relevant factors include "the nature of the crime and the reasonable, logical likelihood of finding useful evidence," *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017).

"The probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotations omitted). To that end, "probable cause leaves plenty of room to draw reasonable inferences from less-than-perfect evidence," *United States v. James*, 3 F.4th 1102, 1105–06 (8th Cir. 2021) (citing *Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020)), and the determination is not evaluated "in hindsight, based on what a search does or does not turn up," *Florida v. Harris*, 568 U.S. 237, 249 (2013). Although "not without limits," officers have "substantial latitude in interpreting and drawing inferences from factual circumstances." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). Finally, the Court is mindful that reviewing courts "owe substantial deference to the determination of probable cause by the issuing judge," *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996), and "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," *Illinois v. Gates*, 462 U.S. 213, 237 n.10 (1983).

To state their claim, Plaintiffs direct the Court to twenty-one alleged insufficiencies in Detective Percich's warrant affidavit, *see* Doc. [1] ¶ 102(a)–(u); *see also* Doc. [14] at 8–9. Plaintiffs assert that Detective Percich "intentionally or recklessly included false statements and material omissions in the affidavit" and, if properly supplemented and corrected, his affidavit "would not have been sufficient to support a finding of probable cause." Doc. [1] ¶¶ 110–11. In response, Defendants assert that Detective Percich is entitled to qualified immunity on this claim because Plaintiffs have failed to plausibly allege a constitutional violation. Doc. [11] at 7. Defendants argue that none of the alleged deficiencies in the affidavit "amount[] to intentional deception or recklessness." *Id.* Further, Defendants argue that none of the alleged omissions or

misstatements "are material to the probable cause or sufficiency analysis of the warrant or its supporting affidavit." *Id.* at 8–9. The Court agrees with Defendants. After a careful review of the many omissions and misstatements that allegedly impair Detective Percich's warrant, the Court finds that "the alleged insufficiencies [are] either non-existent or harmless because [Judge Julian] nonetheless had a substantial basis for finding probable cause." *United States v. Daigle*, 947 F.3d 1076, 1081–82 (8th Cir. 2020).

To begin, Plaintiffs allege several omissions relating to the AirPods and their apparent location. These include Detective Percich's failure in his affidavit to "state how the [Find My] App works," or say "whether the officers who were using the [Find My] App were trained in its use." Doc. [1] ¶ 102 (g)–(h). Plaintiffs also assert that Detective Percich failed to include an image from the application "showing the location of the AirPods" and omitted a more precise description of the Find My application results to specify whether the AirPods were "on the street in front of the home, in the yard of the home, or in the home." *Id.* ¶ 102(e),(i).

As an initial matter, the Court cannot conclude that the officers' training or experience level concerning the Find My application would have been clearly critical to Judge Julian's finding of probable cause. *See Daigle*, 947 F.3d at 1082 ("An officer's testimony about his experience, although relevant, is not a necessary element of a probable cause determination." (quoting *United States v. Brown*, 374 F.3d 1326, 1328 (D.C. Cir. 2004) (cleaned up))). The same is true for a description of the application's functionality or accuracy, especially given the fact that GPS-based tracking[4] is relatively common, and its accuracy has been generally assumed for some time. *See United States v. Brooks*, 715 F.3d 1069, 1078 (8th Cir. 2013) (remarking that "courts generally have assumed" the accuracy of GPS tracking technology). Therefore, Detective Percich cannot be

---

[4] Plaintiffs allege that the "accuracy of the [Find My] App depends on the configuration of adjoining buildings, the location of cell towers, Bluetooth connectivity, WiFi and GPS networks, and other factors." Doc. [1] ¶ 47.

considered reckless when omitting these non-critical facts, and they do not supply the basis for a *Franks* violation. *See Reivich*, 793 F.2d at 961.

The AirPods' apparent location, however, was undoubtedly critical to the probable cause determination here. Put differently, it "was the kind of thing the judge would wish to know," *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 2007), because their location at 1022 Wylin Court provided "evidence of a nexus between [evidence of the carjacking] and [Plaintiffs' home]." *Tellez*, 217 F.3d at 550. The Court therefore proceeds to the second step of the *Franks* analysis and asks whether Detective Percich's affidavit would still support probable cause to search if the allegedly omitted information were added. More specifically, if Detective Percich included an image or statement explaining that the Find My application indicated, as Plaintiffs allege, that the AirPods were located on the street in front of Plaintiffs home, *id.* ¶ 51, would there still be a fair probability of finding evidence of the armed carjacking inside?

The Court concludes that the answer is yes. In the first place, although generally reliable, GPS-based tracking is still an estimate within a targeted area. *See, e.g.*, *In re Application of U.S. for an Ord. Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 533 (D. Md. 2011) ("[C]urrent GPS technology would almost certainly enable law enforcement to locate the subject cellular telephone with a significantly greater degree of accuracy—possibly within ten meters or less."). Thus, a Find My application ping showing stolen AirPods on the street in front of Plaintiffs' suburban residence could still support a reasonable inference that the AirPods were located inside.[5] Moreover, given that AirPods are electronic

---

[5] The Court recognizes that the opposite inference—that the AirPods' true location was that much *farther away* from Plaintiffs' home—is equally reasonable. But "the availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable." *Charron v. County of York*, 49 F.4th 608, 618 (1st Cir. 2022) (finding probable cause to arrest); *see also Cox v. Hainey*, 391 F.3d 25, 32–33 (1st Cir. 2004) ("[W]hen conflicting inferences are available to resolve the issue of probable cause and both of them are plausible, it does not matter which inference is correct." (citation omitted)).

devices, typically kept out of the elements, it was perhaps more reasonable for police to infer that the AirPods' true location was inside Plaintiffs' home rather than on the street out front.

Finally, at least two district courts have found that probable cause existed to search inside a residence when the Find My application pinged stolen property at the corresponding address. *See United States v. Thorne*, 4:18-cr-00029-FL-1, 2019 WL 5608845, at *5 (E.D N.C. Oct. 30, 2019) (finding probable cause to search a residence after the application depicted "a map with a red pin and [defendant's address]");[6] *see also United States v. Rivera*, 234 F. Supp. 3d 346, 351–52 (D.P.R. 2017) (finding probable cause to search after "the iPhone app was utilized to zero-in on a particular stolen piece of property until a specific and identifiable residence had been pinpointed"). Therefore, even after supplementing Detective Percich's affidavit with Plaintiffs' alleged omission—that the Find My application indicated that the stolen AirPods were positioned on the street in front of Plaintiffs' home—the affidavit would still establish a "fair probability" that evidence of the earlier carjacking would be found inside. *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) ("In short, the requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark.").

The Court proceeds to Plaintiffs' assertion that Detective Percich had no reasonable basis to state that "detectives have reason to believe [the still-unidentified carjacking suspect] resides at or frequents 1022 Wylin Court." *See* Doc. [1] ¶ 91 ("The Affidavit does not explain how detectives would have reason to believe an unidentified person resided at or frequented any particular home, particularly Plaintiffs' home."). Plaintiffs thus contend that this statement in Detective Percich's

---

[6] The Court notes that *Thorne* is perhaps distinguishable because officers searched inside defendant's home only after engaging in a knock-and-talk and receiving permission to search defendant's yard for the stolen phone before proceeding inside. *Thorne*, 2019 WL 5608845, at *2. But the crime at issue in *Thorne* was not a crime of violence—only the potential theft of a missing iPhone. Here, given the armed carjacking under investigation and the fact that a potentially armed suspect remained at large, the Court does not fault police for declining to take the same preliminary steps to search for the stolen AirPods while investigating an armed carjacking.

affidavit was false, and it must be deleted from the affidavit as part of the *Franks* analysis.  The Court disagrees.  Statements in a warrant affidavit must be true in that the affiant had "a reasonable basis for the conclusion."  *Davis*, 122 F.4th at 330 (internal quotations omitted).  The question for the Court is whether Detective Percich, "in fact entertained serious doubts as to the truth of the [affidavit] or had obvious reasons to doubt the accuracy of the information contained therein."  *Id.*

Here, the Court cannot conclude that Detective Percich had *obvious* reasons to doubt that the unidentified suspect frequented or resided at Plaintiffs' home.  Accepting Plaintiffs allegations as true, the officers tracked a pair of AirPods, stolen during the underlying carjacking, to a point on the street in front of Plaintiffs' home via GPS-based technology.  Doc. [1-4] ¶ 6; Doc. [1] ¶ 51.  The affidavit also indicates that the AirPods were deposited there relatively quickly after the crime occurred.  Doc. [1-4] ¶¶ 2–6 (describing how officers learned of the AirPods' location "after a short time" while interviewing the carjacking victims and witnesses).  It was therefore reasonable for Detective Percich to believe that 1022 Wylin Court was known to one or more suspects and was readily accessible to them—in other words, an address where they resided or frequented.

In addition, it is generally held that officials "may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence."  *United States v. Williams*, 544 F.3d 683, 688 (8th Cir. 2008) (quoting *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993)) (collecting cases).  Having tracked the fruits of the unidentified suspect's crime to 1022 Wylin Court, *see* Doc. [1-4] ¶ 12 (interviewee stating that the unidentified suspect was one of the two alleged carjackers), the Court does not find that it was altogether unreasonable for officers to believe that the address was a place where the suspect resided or frequented.  *Cf. United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014) (explaining in the arrest-warrant context that an officer's "reasonable belief that the suspect resides at the place to be entered" is determined from the totality

- 14 -

of the circumstances); *United States v. Graham*, 553 F.3d 6, 13 (1st Cir. 2009) ("[P]olice need not possess such rock-solid indicators of residence [such as utility bills or mail] in order to form a 'reasonable belief' that a suspect resides at a given place.").

But that is not all. By the time Detective Percich completed the affidavit, police had apprehended four out of six total carjacking suspects or accomplices, each of whom had gone to great lengths to avoid arrest. *Id.* ¶ 8–11 (describing a car chase and foot chase). As police surveilled Plaintiffs' home, *id.* ¶ 7, and continued to investigate, a still unidentified and possibly armed suspect remained unaccounted for, *id.* ¶ 17. All the while, the apparent location of the stolen AirPods remained consistent throughout the day. *Id.* ¶ 16. Under the totality of these circumstances and considering the officers' "substantial latitude in interpreting and drawing inferences from factual circumstances," *Kuehl*, 173 F.3d at 650, there was a reasonable basis to believe that the AirPods' GPS-based location signaled the unidentified suspect's last known location and—not improbably—his present location, hidden indoors in an attempt to evade police detection.[7] Taken together, the Court finds that the totality of the circumstances gave Detective Percich a reasonable basis for his statement that there was "reason to believe that [the unidentified suspect] resides at or frequents 1022 Wylin Court." Doc. [1-4] ¶ 17. Because it does not appear

---

[7] Plaintiffs assert that this cannot be the case because, as they recite the facts in Detective Percich's affidavit, gas-station surveillance footage "showed all six of the original criminals interacting with one another." Doc. [1] ¶ 76 (reciting what the affidavit states "at paras. 13-15"). Relatedly, Plaintiffs allege that Detective Percich omitted the timestamp of that video from the affidavit, and "if surveillance at 1022 Wylin Court began before . . . all six criminals were on tape . . . there would be no chance one or both of the uncaptured criminals was at 1022 Wylin Court at the time of the SWAT Team Raid." *Id.* ¶ 102(n). But Plaintiffs misstate the affidavit. The cited paragraph states only that "[t]he occupants of the vehicles appeared to communicate with one another." Doc. [1-4] ¶ 15. It does not say that all six individuals were visible or, indeed, that any individuals were visible at all. Accordingly, even if the Court (1) found that this omitted information was "clearly critical" to the finding of probable cause, *Reivich*, 793 F.2d at 961, (2) supplemented the affidavit with the allegedly omitted timestamp, and (3) the timestamp indicated that the surveillance of Plaintiffs' home began before the video was recorded, the affidavit would still support a reasonable inference that the unidentified suspect was present inside Plaintiffs' home. *See Smith*, 715 F.3d at 1118 (explaining that the relevant question under *Franks* is whether the affidavit would still support probable cause after being supplemented or corrected). After all, the surveillance of Plaintiffs' home can only have started *after* the stolen AirPods reached that location as indicated by the Find My application, and the affidavit does not say that the unidentified suspect was visible in the surveillance video, no matter when it was recorded.

that Detective Percich "entertained serious doubts as to the truth of [his statement] or had obvious reasons to doubt [its] accuracy," *Davis*, 122 F.4th at 330, the statement is not false such that it can form the basis of a *Franks* violation.

The Court next addresses Plaintiffs' contention that Detective Percich "actually had no reason to believe that any of the items in his list of items ('firearms, ammunition, holsters, [and] firearm related material') were at Plaintiffs' home." *Compare* Doc. [1] ¶ 102(a), *with* Doc. [1-4] at 1. Given the circumstances, the Court concludes that he did. At the time Detective Percich prepared his affidavit, a group of high-school students had been carjacked by two suspects, both of whom reportedly displayed firearms, "with at least one equipped with a drum magazine." Doc. [1-4] ¶ 3–4. AirPods stolen during the carjacking were tracked to Plaintiffs' address, and they appeared to remain there during the day. *Id.* ¶¶ 6, 17. Officers later learned that a group of six individuals were affiliated with the carjacking, only four had been apprehended, and two were still missing, including one of the alleged carjackers. *Id.* ¶ 12 (reporting that the "male in the blue sweatshirt, whose identity remained unknown, approached the victims and relieved them of [their car]"). As four of the suspects were placed under arrest, officers found two firearms with drum magazines along with a collection of the victims' stolen property. Further, as already discussed, "detectives had reason to believe that the [unidentified suspect] resided at or frequented 1022 Wylin Court." *Id.* ¶ 17.

Collectively, these circumstances provided Detective Percich with a reasonable basis to believe that there were additional firearms, ammunition, and firearm-related material inside Plaintiffs' home. Put differently, there were not "obvious reasons to doubt" that this was the case. *Davis*, 122 F.4th at 330. "[Drawing] on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, the Court finds that it was reasonable for Detective Percich to infer that a violent

criminal would possess multiple firearms in addition to ammunition and related gear.  What is more, the violent nature of the crime under investigation here, the number of people seemingly involved, the fact that the firearms that police had already recovered were modified with accessories to fire additional rounds, and the fact that officers reasonably believed the missing suspect frequented or resided at Plaintiffs' address suffice to establish Detective Percich's reasonable belief that the relevant contraband would be found at 1022 Wylin Court. *Cf. Messerschmidt v. Millender*, 565 U.S. 535, 548–49 (2012) (concluding that, in the context of a challenge to a warrant's overbreadth, it was not "entirely unreasonable" for officers to search for "all firearms and firearm-related materials" based on the violent nature of the underlying crime, the fact that the specific firearm involved was a modified sawed-off shotgun with a pistol grip, the suspect's known gang affiliation, and the fact that the items would "aid in the prosecution of the criminal act at issue" (cleaned up)); *accord Kiesling*, 859 F.3d at 536–37 (holding that officers were entitled to qualified immunity for executing a search warrant with a broad firearms category given the nature of the crime and the fact that the evidence would aid in its eventual prosecution).

The remaining alleged omissions run headlong into the general principle that, "in a warrant affidavit, the government need only show facts sufficient to support a finding of probable cause." *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir. 1995); *see also Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001) ("A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not.").  After all, "the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008).  With these principles in mind, even if Plaintiffs plausibly allege that Detective Percich knew all of the additional

information he omitted, *see Hartman*, 39 F.4th at 546 (8th Cir. 2022) (per curiam) ("[A]n officer who does not personally know information cannot intentionally or recklessly omit it."), the Court finds that the information would not have vitiated the substantial basis for probable cause to search Plaintiffs' home, established by the totality of circumstances described above.[8]

Because the Court finds no constitutional violation, it need not reach the "clearly established right" prong of the qualified immunity analysis. *Watkins*, 102 F.4th at 951.  However, even if a violation were found, the Court observes that Plaintiffs allege no facts indicating that Detective Percich omitted material information or made misstatements intentionally or knowingly. Moreover, the Complaint on its face fails to show that Detective Percich was plainly incompetent when preparing the search warrant affidavit here.   To the extent this can be described as a close case with respect to Count I, such a description would support the availability of qualified immunity.  *See Batistini v. Aquino*, 890 F.2d 535, 538 (1st Cir. 1989) (joined by Breyer, J.) ("The very fact that a question is close," though, "strengthens [Defendants'] qualified immunity defense by indicating that the law was not clearly established in [P]laintiff's favor.").   In short, qualified immunity should be available to Detective Percich under these circumstances.  *See Bagby v. Brondhaver*, 98 F.3d 1096, 1099 (8th Cir. 1996) ("We have doubts about . . . [the proposition] that defendant is never entitled to qualified immunity if the corrected affidavit is insufficient [to support probable cause] because that rule may in some cases fail to serve the qualified immunity purpose

---

[8] These remaining omissions largely include: the names of the other investigating officers, Doc. [1] ¶ 102(b), whether Waffle House surveillance video showed the carjackers displaying firearms, *id.* ¶ 102(c); *but see* Doc. [1-4] ¶ 4 (describing eyewitness reports that "both suspects displayed firearms"), what surveilling officers might have seen while watching Plaintiffs' home, *id.* ¶ 102(j), a description of "any later effort" to locate the carjacking suspects' other two passenger cars, id. ¶ 102(l), whether the four apprehended suspects were detained, released, or arrested, *id.* ¶ 102(m), whether detectives asked the detained suspects about the AirPods or 1022 Wylin Court, *id.* ¶ 102(o), how detectives learned that the AirPods' GPS-based location remained at Plaintiffs' home later in the day, *id.* ¶ 102(p), additional information about the no-knock authorization, *id.* ¶ 102(q)–(r) and (t), and a delineation of information that was personally known to Detective Percich versus that which he gleaned from other officers, *id.* ¶ 102(u).

- 18 -

of sparing all but the plainly incompetent from § 1983 damage liability."); *see also Banks v. Hawkins*, 999 F.3d 521, 532 (8th Cir. 2021) (Stras, J., dissenting) ("The Supreme Court has told us over and over again that any generalized right . . . must be clearly established in a particularized sense to overcome qualified immunity." (cleaned up)); *but see Turpin v. County of Rock*, 262 F.3d 779, 783 (8th Cir. 2001) ( "The law was clearly established at the time in question in this case that an affidavit for a search warrant containing materially false statements or omissions knowingly or recklessly made in conscious disregard for the truth violates the Fourth Amendment.").

Because Plaintiffs have failed to allege material omissions that, if added, would have sufficiently disrupted Judge Julian's probable cause determination, or any false statements sufficient to establish a *Franks* violation, the Court will grant Defendants' Motion to Dismiss with respect to Count I.

**B. Excessive Force and Unreasonable Seizure Claims (Counts II, III, and IV)**

Next, Plaintiffs assert three interrelated claims against Detective Percich for excessive use of force and unreasonable seizure in violation of the Fourth Amendment. *See Carter v. Huterson*, 831 F.3d 1104, 1109 (8th Cir. 2016) ("The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person."). Defendants move  to dismiss all three. Doc. [10]. The Court addresses each in turn.

**a. Detective Percich is entitled to qualified immunity for the decision to authorize the Tactical Operations Unit (Count II).**

First, Plaintiffs assert that Detective Percich violated their Fourth Amendment rights when he decided to authorize the Tactical Operations Unit to search their home. Doc. [1] ¶¶ 218–19. Plaintiffs assert that the use of the Unit constitutes excessive force because "it was not reasonably necessary in order to investigate the carjacking." *Id.* Defendants move to dismiss this claim because (1) Plaintiffs provide no factual support for the allegation that Detective Percich decided

to use the Tactical Operations Unit, and (2) using the Tactical Operations Unit was justified under the circumstances. Doc. [11] at 10, 10 n.3.

Beginning with the former argument, it is true that "[i]n a § 1983 case an official is only liable for his own misconduct." *Z.J.*, 931 F.3d at 688 (8th Cir. 2019) (quoting *Briscoe v. City of St. Louis*, 690 F.3d 1004, 1011 (8th Cir. 2012)). Section 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights." *Id.* (quoting *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)). The question at the motion to dismiss stage is whether Plaintiffs have put forth allegations that, taken as true, permit the Court to "draw the reasonable inference that [Detective Percich] is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

In his affidavit, Detective Percich asks Judge Julian for "authorization to serve this search warrant in a 'no knock' manner, if deemed appropriate by personnel assigned to the [Tactical Operations Unit]." Doc. [1-4] ¶ 17. He recites facts seeking to justify such an authorization. *Id.* The affidavit indicates that Detective Percich sought no-knock authorization on behalf of the Tactical Operations Unit, independent from the Unit's ultimate decision whether a no-knock execution of the warrant would be necessary under the circumstances. *Id.* The Court will assume that these facts are sufficient to demonstrate Detective Percich's direct responsibility over the decision to authorize the Tactical Operations Unit because, even if he made the decision, it was reasonable under the circumstances to do so. *United States v. Lewis*, 864 F.3d 937, 945 (8th Cir. 2017) ("Reasonableness is always the touchstone of Fourth Amendment Analysis.").

The Eighth Circuit has held that "[a]n officer's decision to authorize a SWAT team to execute a warrant can, in some cases, constitute a Fourth Amendment violation." *Z.J.*, 931 F.3d at 688 (8th Cir. 2019) (citing *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189–92 (10th Cir. 2001)). Further, "it is clear the decision to send a SWAT team into a residence must be

reasonable." *Id.* The reasonableness of such a decision is measured by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Holland*, 268 F.3d at 1190 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (alteration in the original).

Defendants direct the Court to *Ramage v. Louisville/Jefferson County Metro Government* to illustrate that the decision to authorize the Tactical Operations Unit was reasonable here. 520 F. App'x 341 (6th Cir. 2013). There, the Sixth Circuit found that the SWAT-team authorization was justified because "detectives had reason to expect that [defendant] would be on the property; [and] from his criminal history, they reasonably anticipated that he might be armed. *Id.* at 346. Under those circumstances, there was "substantial risk for the officers executing the warrant." *Id.*

The same rationale clearly applies. As discussed above, Detective Percich asked for and received a properly supported, no-knock warrant to search Plaintiffs' home because there was probable cause to believe that they would find evidence of an armed carjacking inside, including firearms and ammunition. One of the allegedly armed suspects had evaded police throughout the day, and officers had a reasonable basis to believe that he frequented or resided at the home. Under these circumstances, the Court cannot find that it was unreasonable to authorize the Tactical Operations Unit to undertake the search because the governmental interest in officer safety outweighed Plaintiffs' Fourth Amendment interests in avoiding such a show of force. *See United States v. Lewis*, 864 F.3d 937, 945 (8th Cir. 2017) (characterizing "the Government's interest in minimizing the risk of harm to the officers" as "an important interest" (internal quotations omitted)).

Moreover, the Eighth Circuit has previously described a "*close* question of whether the detectives' decision to use [a] SWAT team . . . violated the Fourth Amendment," *Z.J.*, 931 F.3d at 688 (emphasis added), where detectives authorized a SWAT team to search what they believed to be the home of an already-apprehended, suspected murderer, *id.* at 677–78, but "had no information that would have supported the need to send the SWAT team to execute the search warrant . . . [and had undertaken] virtually no investigation that would have provided them with more information about whether the use of the SWAT team was appropriate," *id.* at 688.  By contrast, the question of whether Detective Percich reasonably authorized the Tactical Operations Unit is not as close as the one described above.  For all these reasons, the Court concludes that the decision to authorize the Tactical Operations Unit was reasonable under the circumstances.  Accordingly, the Court will grant Defendants' Motion to Dismiss  with respect to Count II.

### b. To the extent Plaintiffs state a claim, Detective Percich is entitled to qualified immunity for the amount of force used during the search (Count III).

Plaintiffs' second excessive force claim fares no better.  Plaintiffs seek to hold Detective Percich liable for the conduct of the officers executing the search warrant.  Plaintiffs argue that the actions of those officers, including breaking down Plaintiffs' door, wearing "combat regalia," pointing guns at Plaintiffs Briscoe and Shamily, ransacking their house, forcing Plaintiff Shamily outside in her underwear, and separating her from her baby constituted excessive force because it "was not reasonably necessary in order to investigate the carjacking."  Doc. [1] ¶¶ 117–44, 223.

Plaintiffs fail to state a claim for two reasons.  First, neither the facts alleged in Plaintiffs' Complaint nor those recited in the search warrant affidavit support a "reasonable inference" that Detective Percich was responsible for the conduct of those officers such that he can be held liable under § 1983 for their alleged excessive force.  *See Lustgraaf*, 619 F.3d at 873.  To rephrase, Plaintiffs' allegations for this claim "do not permit the court to infer more than the mere possibility

of misconduct" on the part of Detective Percich.  *Iqbal*, 556 U.S. at 679.  Second, even if Detective

Percich was responsible for the actions of the Tactical Operations Unit that evening, their actions

were reasonable under the circumstances.

As explained in the prior section, liability under 42 U.S.C. § 1983 is personal.  *Frederick*

*v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017).  That is, "[g]overnment officials are personally

liable only for their own misconduct."  *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

"[D]irect responsibility" for the deprivation of rights is required.  *Madewell v. Roberts*, 909 F.2d

1203, 1208 (8th Cir. 1990) ("Liability under § 1983 requires a causal link to, and direct

responsibility for, the deprivation of rights.").   To establish Detective Percich's direct

responsibility for the conduct of the various officers who searched their home, Plaintiffs describe

the officers as "Detective Percich's SWAT team," *id.* ¶ 221, but allege only that, "[o]n information

and belief Detective Percich was the leader of the SWAT Team Raid," *id.* ¶ 116, and "[o]n

inference, Defendant Officer Percich was responsible for the tactical decisions made in the course

of the SWAT Team Raid," *id.* ¶ 172.   These "on information and belief" allegations are

inappropriate under the facts alleged.

The Eighth Circuit has held that "allegations pled on information and belief are not

categorically insufficient to state a claim for relief where the proof supporting the allegation is

within the sole possession and control of the defendant or where the belief is based on sufficient

factual material that makes the inference of culpability plausible."  *Ahern Rentals, Inc. v.*

*EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023).  But neither principle applies here.

In the first place, "proof supporting the allegation" that Detective Percich led the search of

Plaintiffs' home or directed the officers' conduct is not within Defendants' *sole* possession

because, by Plaintiffs' own statements in their Complaint, they possess bodycam footage of the

events at issue.  *Ahern Rentals*, 59 F.4th at 954.  More than that, Plaintiffs were at the scene.
Doc. [1] ¶¶ 145, 194.  Surely Plaintiffs should be able to point to interactions they had with
officers, conversations they overheard, events they witnessed, or events depicted on the camera
footage that is now in their possession to plead facts that plausibly show Detective Percich's role
in leading the search of their home or otherwise directing the officers' actions during the search.
*See, e.g.*, *Zeikos Inc. v. Walgreen Co.*, 1:23-cv-00303, 2023 WL 3947775, at *5 (N.D. Ill. June 12,
2023) (finding "on information and belief" allegations improper and insufficient to state a claim
where defendant did "not have exclusive control over the information underlying [the] allegations"
and plaintiff "should know" facts underpinning his assertions).

Moreover, the facts alleged do not "make[] the inference of [Detective Percich's]
culpability plausible."  *Ahern Rentals*, 59 F.4th at 954.  There are no factual allegations tying
Detective Percich to the actions of the Tactical Operations Unit officers.  Indeed, the affidavit
suggests that Detective Percich was *not* responsible for the conduct of the Tactical Operations Unit
during the search of Plaintiffs' home because, as the warrant affidavit indicates, Unit *personnel*
had the ultimate decision-making authority about what practices and tactics were appropriate
during the search.  *See* Doc. [1-4] ¶ 17 ("[D]etectives seek authorization to serve this search
warrant in a 'no knock' manner, *if deemed appropriate by personnel assigned to the . . . Tactical
Operations Unit* (emphasis added)).  Therefore, Plaintiffs' Complaint fails to plead facts that
"permit the court to infer more than the mere possibility" that Detective Percich was sufficiently
responsible for the officers' conduct such that he can be held liable for their alleged excessive
force.  *Iqbal*, 556 U.S. at 679.  To find otherwise would require holding Detective Percich liable
for more than his own misconduct, and § 1983 does not permit the Court to do so.  *See S.M.*, 808
F.3d at 340 ("Government officials are personally liable only for their own misconduct.").

But even if the factual allegations permitted the Court to infer Detective Percich was responsible for the officers' actions, Defendants argue that the officers' conduct was reasonable. Doc. [11] at 10–11. In support, Defendants again direct the Court to *Ramage* where SWAT officers seized a woman while displaying their weapons, forced her to the ground, and handcuffed her during the search. 520 F. App'x at 347. The Sixth Circuit found no excessive force, noting that "[w]hile hindsight may show that these actions were unnecessary, the officers' actions are not judged in hindsight, but by whether they were objectively reasonable at the time." *Id.*

The Supreme Court has explained that, in the context of securing a residence when executing a search warrant, there are "three legitimate law enforcement interests that provide substantial justification for detaining an occupant: 'preventing flight in the event that incriminating evidence is found;' 'minimizing the risk of harm to the officers;' and facilitating 'the orderly completion of the search.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 701–05 (1981)). The authority to detain includes the ability "to use reasonable force to effectuate the detention." *Id.* at 98–99. "An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Chambers v. Pennycook*, 641 F.3d 898, 905–06 (8th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

To find the officers' alleged conduct unreasonable here would require the benefit of hindsight. During the "tense, uncertain, and rapidly evolving" events as the search of Plaintiffs' home began, *Graham*, 490 U.S. at 397, officers reasonably believed that they were entering a home resided at or frequented by an armed-carjacking suspect. Further, there was a fair probability that firearms and property stolen during the earlier carjacking would be found inside.

Tactical Unit officers shouted and displayed firearms to quickly gather Plaintiff Shamily, Plaintiff Briscoe, and their children on the sidewalk in front of their house.  It is clear that this was done in an effort to further the officers' legitimate interests in effectuating the search, preventing flight, and minimizing safety risks.  *Muehler*, 544 U.S. at 98.  True, Ms. Shamily was compelled to abandon her baby and proceed into the yard in a state of undress, but the allegations in the Complaint indicate that this was for a period of four or five minutes before she was reunited with her child and given an opportunity to cover herself.  Doc. [1] ¶¶ 135–37.  In total, the family was detained for thirty minutes while officers searched for the contraband listed in the warrant.  *Id.* ¶ 147.  They were not otherwise restrained or physically injured during the search.  Although this unfortunate incident was undoubtedly "frustrat[ing], embarrass[ing], and humiliat[ing]" for Plaintiffs, the Court does not find that the officers' alleged conduct was a Fourth Amendment violation under the circumstances.  *See Los Angeles County v. Rettele*, 550 U.S. 609, 616 (2007) ("When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm . . . the Fourth Amendment is not violated."); *see also Muehler*, 544 U.S. at 100 (finding that a two-to-three-hour detention in handcuffs did not outweigh the government's continuing safety interests where a warrant authorized "a search for weapons and a wanted gang member reside[d] on the premises"); *see also P.M. ex rel. Whitworth v. Bolinger*, 2:10-cv-4208-NKL, 2011 WL 5838406, at *5 (W.D. Mo. Nov. 21, 2011) (finding no violation to yell and point guns at non-threatening individuals where "a reasonable officer could, in the heat of the moment, rely on such tactics to prod individuals to move swiftly through a potentially dangerous situation").

Nor does the level of property damage alleged in the Complaint rise to the level of a constitutional violation, especially given the nature of the items listed as contraband in the warrant and the fact that those items could reasonably be concealed throughout the home in a variety of

places, including inside drawers and within a drop ceiling.  *See, e.g.*, *Cook v. Gibbons*, 308 F. App'x. 24, 28 (8th Cir. 2009) ("[O]fficers executing search warrants on occasion must damage property in order to perform their duty." (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 4.10(d) (6th ed.) ("The destruction of property in carrying out a search is not favored, but it does not necessarily violate the Fourth Amendment; the standard is reasonableness."). *cf. DeArmon v. Burgess*, 388 F.3d 609, 611 (8th Cir. 2004) (granting qualified immunity to officers who "broke entry doors and locks on interior doors, [and] damaged drywall and furniture");  Therefore, for all these reasons, the Court will grant Defendants' Motion to Dismiss with respect to Count III.

### C.  Plaintiffs' Unreasonable Seizure claim (Count IV) must fail under the facts alleged.

As indicated in their briefing, Plaintiffs assert Count IV against Detective Percich as an "alternative and inconsistent theor[y]" to Counts I, II, and III.  Doc. [14] at 14.  Plaintiffs argue that Detective Percich "seized each Plaintiff when investigating the carjacking, and . . . the seizures were unreasonable because [they were] not necessary to investigate the carjacking."  Doc. [1] ¶¶ 226–27.  However, considering the Court's findings regarding Plaintiffs' other Counts against Detective Percich, it is clear that Plaintiffs have failed to state a claim against him for an unreasonable seizure.  *See Muehler*, 544 U.S. at 98 ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.").  Even if the Complaint plausibly alleged that Detective Percich seized Plaintiffs, the Court has found that (1) the warrant authorizing the search of Plaintiffs' home was valid under the facts alleged, and (2) the amount of force allegedly used to execute the search was not a constitutional violation.  It follows that the Plaintiffs' seizure during

the search of their home was not unreasonable under the facts alleged.  The Court will therefore dismiss Count IV for failure to state a claim.

### D. Plaintiffs have failed to state a plausible claim against St. Louis County (Count V).

Turning now to Plaintiffs' claim against Defendant St. Louis County, they argue that the County should be subject to municipal liability for the search of their home because "it is the policy of St. Louis County to use SWAT in circumstances when it is not justified."  Doc. [1] ¶ 231.  Plaintiffs further allege that "St. Louis County slowly, methodically, intentionally and deliberately put into place its SWAT team policies, procedures, and customs that invited [the] excessive use of force" in this case,  *id.* ¶ 160, and that "St. Louis County has a continuing, widespread, and persistent pattern of routinely using SWAT when it is not justified, *id.* ¶ 168.

In the Eighth Circuit, "[m]unicipal liability will not attach unless individual liability is found on an underlying substantive claim."  *White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017) (internal quotations omitted).  Thus, having found that Plaintiffs have failed to state a claim on Counts I–IV, Plaintiffs have  necessarily  failed  to  state  a  municipal-liability  claim  against Defendant St. Louis County.  But even if the Court found that Plaintiffs had sufficiently alleged individual liability on the part of Detective Percich, the Court would still find Plaintiffs' allegations insufficient to plausibly state a claim as to Count V.

The pleading standard for municipal-liability claims is the same as any other; a plaintiff "must allege facts sufficient to state a claim for relief that is plausible on its face."  *Watkins*, 102 F.4th at 953 (quoting *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013)).  "Threadbare recitals  of  the  elements  of  a  cause  of  action,  supported  by  mere  conclusory  statements"  are insufficient.  *K.T.*, 865 F.3d at 1057 (internal quotations omitted).  Thus, to avoid dismissal for failure to state a claim, Plaintiffs "must allege facts which would support the existence of an

unconstitutional policy or custom." *Watkins*, 102 F.4th at 954 (quoting *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 588, 591 (8th Cir. 2003). They have not done so.

Plaintiffs' allegations that St. Louis County has "slowly, methodically, intentionally, and deliberately" put into place unconstitutional policies and that the County "has a continuing, widespread, and persistent patten of routinely using SWAT when it is not justified" are wholly conclusory statements that—adverbs notwithstanding—merely recite the elements of a municipal liability claim. Such allegations are insufficient. *See K.T.*, 865 F.3d at 1057. As to the issue of an unconstitutional official policy, Plaintiffs' allegations are inadequate because they fail to identify "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Watkins*, 102 F.4th at 954 (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)) (finding no plausible municipal-liability claim).

Plaintiffs also fail to allege "facts that support the existence of an unconstitutional unofficial custom." *Id.* In order to do so, a complaint must set forth factual allegations "plausibly suggesting '(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the [municipality's] employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the [municipality's] custom.'" *Id.* (quoting *Mitchell v. Kirchmeier*, 28 F.4th 888, 899 (8th Cir. 2022). Here, the facts alleged relate solely to the May 2023 search of Plaintiffs' home, a single incident of alleged police misconduct. This is simply not enough to plausibly allege the existence of a municipal custom. *See id.* ("[G]enerally, an isolated incident of alleged police misconduct cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." (quoting *Ulrich*, 715 F.3d at 1061)). For all of these reasons, the Court will grant Defendants' Motion to Dismiss with respect to Count V.

## II.    Missouri Sunshine Law Violation (Count VI)

Finally, Plaintiffs assert a state-law claim against Defendant St. Louis County for a violation of the Missouri Sunshine Act,  Doc. [1] ¶¶ 235–43; *see* Mo. Rev. Stat § 610.027, arguing that the Court has supplemental jurisdiction over their claim.  Doc. [1] ¶ 4.  However, assuming supplemental jurisdiction exists,[9] the Court declines to exercise it because the Court has dismissed all of Plaintiffs' federal claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [where] the district court has dismissed all claims over which it has original jurisdiction.").  The Court will therefore grant Defendants' Motion with respect to Count VI and dismiss the claim without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, Doc. [10], is **GRANTED**.

**IT IS FURTHER ORDERED** that a separate Order of Dismissal will be filed herewith.

Dated this 26th day of March 2025.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

---

[9] The Court is not convinced that this state-law claim "derive[s] from a common nucleus of operative fact" with Plaintiffs' § 1983 claim such that "the [Court] may 'try them all in one judicial proceeding.'"  *Hunter v. Page County*, 102 F.4th 853, 868 (8th Cir. 2024).  *See Benyi v. Broome County*, 887 F. Supp. 395, 401 (N.D.N.Y. 1995) (finding no supplemental jurisdiction over an inmate's claim under the New York Freedom of Information Law, joined with a § 1983 claim, because "[t]he Constitutional right to personal safety [under the Eighth Amendment] and a request for documents are distinct factually and legal[ly]").  Setting aside the subject matter of Plaintiffs' requests, the operative facts giving rise to Plaintiffs' § 1983 claims for violations of their Fourth Amendment rights are wholly separate from any operative facts giving rise to the alleged violation of the Missouri Sunshine Act, especially because the latter claim arises out of "separate events that took place more than a year" after the search of Plaintiffs' home.  *Stroud v. Steffen*, 4:23-cv-01118, 2024 WL 379344, at *4 (E.D. Mo. 2024) (declining to exercise supplemental jurisdiction over a Missouri Sunshine Act claim in conjunction with plaintiff's § 1983 claims).  The Court does not reach Defendants' abstention argument.  Doc. [11] at 14–15.